**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA RANDOLPH, | ) | CASE NO. 1:15-CV-01451 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Barbara Randolph ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying her application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("Act").  This case is

before the undersigned United States Magistrate Judge pursuant to the consent of the

parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth

below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On August 9, 2011, Plaintiff filed her application for SSI, alleging a disability

onset date of December 30, 2009.[1]  (Transcript ("Tr.") 31.)  The claims were denied

initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id*.)  On September 23, 2013, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and

testified.  (*Id*.)  A vocational expert ("VE") and a medical expert ("ME") also participated

---

[1]  The alleged onset date was amended to August 9, 2011 at the hearing.  (Tr. 31.)

and testified.  (*Id*.)  On September 19, 2014, the ALJ found Plaintiff not disabled.  (Tr. 43.)  On June 23, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On July 23, 2015, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.)

Plaintiff asserts the following assignments of error: (1) the ALJ erred by failing to ascribe appropriate weight to the opinion of a non-treating physician; (2) the ALJ failed to perform a proper "materiality" analysis with respect to claimant's drug and alcohol abuse; and (3) the ALJ failed to perform a proper credibility analysis.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in May 1965 and was 43-years-old on the alleged disability onset date.  (Tr. 41.)  She had at least a high school education and was able to communicate in English.  (*Id.*)  She had past relevant work as a housekeeper/cleaner. (*Id.*)

### B.   Medical Evidence[2]

#### 1.   Medical Reports

On July 14, 2011, an x-ray of Plaintiff's cervical spine was taken secondary to an assault upon her person with a baseball bat leading to complaints of neck and shoulder

---

[2]  Plaintiff's assignment of error revolve primarily around her psychological impairments, her allegations of pain, and substance abuse.  As such, the recitation of the evidence will primarily focus on these issues.

2

pain.  (Tr. 356.)  The x-ray revealed that vertebral body heights were well maintained with mild disc space narrowing at C4 through C7, with findings most marked at C6-C7. (*Id*.)

On August 22, 2011, Plaintiff presented to Philip Tomsik, M.D., with complaints of anxiousness stemming from a PET scan performed a week earlier, which revealed a hypermetabolic nodule.  (Tr. 1216-17.)  She smoked 1 to 2 packs of cigarettes daily and took Xanax twice a day.  (*Id*.)

On September 1, 2011, a biopsy revealed the presence of malignant cells derived from adenocarcinoma.  (Tr. 412.)

On September 16, 2011, Plaintiff was diagnosed with mild chronic obstructive pulmonary disease ("COPD"), but clinically moderate to severe.  (Tr. 485.)

On October 24, 2011, Plaintiff underwent a right upper lung lobectomy.  (Tr. 526, 1118.)

On November 23, 2011, Plaintiff was seen by pain specialist Ellen W. King, M.D., at the request of Dr. Tomsik.  (Tr. 1268.)  Plaintiff reported right thoracic and chest wall pain post-thoracotomy.  (*Id*.)  She indicated that she had been taking Percocet with reduced relief, but that she had run out of her medication.   (Tr. 1268-71.) Dr. King found Plaintiff's pain was consistent with neuropathic pain, explained that such pain can occur after a thoracotomy, and that medications that target neuropathic pain are more effective than opioid pain medications.  (Tr. 1271.)  Dr. King also recommended nerve blocks, which Plaintiff refused.  (*Id*.)  Plaintiff stated that she is "not going 6 weeks without pain pills."  (*Id*.)  Dr. King did not recommend the continued

3

use of opioids and Plaintiff declined to begin any new medications without speaking to her oncologist. (Tr. 1271-72.)

On December 7, 2011, Plaintiff began chemotherapy treatment. (Tr. 1330-1333, 1345, 1354.) Plaintiff complained of severe chest pain. (Tr. 733, 1365-66.) Kevin J. Kerwin, M.D., noted that patient appeared to be in no acute distress and indicated that Plaintiff had declined Dr. King's pain management plan largely because it did not include opiates. (*Id*.) Dr. Kerwin stated that due to Plaintiff's history of "multiple opiate prescribers and many untruths about her care, drug-seeking behaviors and/or opiate addiction are strongly suspected." (*Id*.) Dr. Kerwin informed Plaintiff that neither he nor any of his partners would ever prescribe her any controlled substances for any reason. (*Id*.)

On December 28, 2011, a pulmonary function study revealed a mild obstructive ventilatory defect. (Tr. 632.)

On January 31, 2012, Plaintiff presented to Dr. Kerwin and denied any chest pain, shortness of breath at rest, or any other major problems. (Tr. 749.)

On February 15, 2012, Plaintiff reported nausea and vomiting secondary to chemotherapy treatment, as well as right lateral chest pain, back pain, and that her teeth hurt. (Tr. 1202.) She stated that she continued to suffer from anxiety with panic and takes Xanax, for which she requested a refill. (*Id*.) Dr. Tomsik noted there have been concerns about Plaintiff abusing her medications, but, nevertheless, prescribed Percocet and Xanax. (Tr. 1202-03.)

On February 23, 2012, Plaintiff presented to the Emergency Room ("ER") with a left arm infection. (Tr. 662.) She admitted intravenous heroin use. (Tr. 662-63, 670.)

4

On April 25, 2012, Plaintiff reported to the ER complaining of worsening panic attacks. (Tr. 791.) She was diagnosed with anxiety. (Tr. 792.) She returned to the ER on April 28, 2012, complaining that she had lost the prescription for 20 pills of Valium she received at the visit three days earlier. (Tr. 799-800.)

On July 21, 2012, Plaintiff presented to the ER stating that she had been in a car accident the previous day. (Tr. 893.) She described her pain as burning and rated in 10 of 10. (*Id*.) She also complained of anxiety attacks the preceding month, but was not experiencing one at the time. (*Id*.) On examination, Plaintiff appeared to be in no acute distress, had mild tenderness over her chemotherapy port, and clear lungs. (Tr. 894.) After reviewing the OARRS ("Ohio Automated Rx Reporting System") report, the attending physician noted that Plaintiff had obtained several benzodiazepine prescriptions (*e.g.*, Xanax or Valium) from multiple providers in the past year. (*Id*.) The physician had a lengthy discussion with patient regarding pain management, but Plaintiff wanted something stronger than Motrin. (*Id*.) The physician also told Plaintiff that she did not need benzodiazepine because she was not having an acute anxiety attack and, furthermore, that she needed to establish psychiatric care for her anxiety. (*Id*.) She was taken for an x-ray by a nurse, but Plaintiff eloped from the hospital before one was performed. (*Id*.)

On August 3, 2012, Plaintiff again reported to the ER with complaints of an anxiety attack. (Tr. 919.)

On October 14, 2012, Plaintiff presented to MetroHealth stating she had been having panic attacks all weekend. (Tr. 973.)

5

On September 17, 2012, an x-ray revealed no subluxation or fractures; verterbral

bodies were preserved in height; severe narrowing of the L5-S1 disk space with

endplate sclerosis and vacuum disk; moderate narrowing of the L3-L4 disk space with

small endplate phytes at different levels; and no destructive bony lesions.  (Tr. 1014.)

On October 23, 2012, Plaintiff presented to the ER complaining of anxiety, stated

that she was out of medication, and requested Xanax.  (Tr. 1020.)  She was negative

for chest pain and back pain.  (Tr. 1022.)

On November 17, 2012, Plaintiff was ascribed a Global Assessment of

Functioning ("GAF") score of 54.[3]  (Tr. 985.)

On February 12, 2013, Plaintiff presented to the ER complaining of anxiety

symptoms after she ran out of Xanax one week earlier and had to appear in traffic

court.  (Tr. 1062.)  She was panicking because she believed she would be placed in jail

for multiple traffic violations.  (Tr. 1062.)

On June 6, 2013, Plaintiff was admitted for treatment upon the referral of the

court after being charged with OVI in March of 2013.  (Tr. 1098.)  Treatments notes

state that "Plaintiff indicated that she was very involved in gardening and running her

farm and reports she 'loves it.'  She also enjoys spending time with her grandchildren,

---

[3]   The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34
(American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV").  An individual's
GAF is rated between 0-100, with lower numbers indicating more severe mental
impairments.  A GAF score between 51 and 60 indicates moderate symptoms or
moderate difficulty.  DSM-IV at 34.  In 2013, an update of the DSM eliminated the GAF
scale because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at
16 (American Psychiatric Ass'n, 5th ed., 2013).

6

her animals, and fishing." (Tr. 1099.)  Margaret Graham, PCC-S, diagnosed opioid dependence; sedative, hypnotic, and anxiolyic dependence; and, assigned a GAF score of 50.[4]  No other psychological disorders were diagnosed. (Tr. 1111-1112.)  Mental status examination revealed normal findings. (Tr. 1105-1107.)

On August 26, 2013, Plaintiff presented to the ER with complaints of anxiety, stating she had run out of Xanax and Lexapro two weeks earlier. (Tr. 1123.)  She was negative for chest pain, shortness of breath, and back pain. (Tr. 1125.)

On September 1, 2013, Plaintiff was diagnosed with opioid overdose with dyspnea. (Tr. 1128.)

On December 4, 2013, Plaintiff reported that she was suffering from weekly panic attacks, but indicated Celexa helped some as she had no visits to the ER the past month. (Tr. 1190.)

### 2.    Agency Reports

On February 29, 2012, Plaintiff was seen by Thomas M. Evans, Ph. D., for a psychological evaluation at the request of the Ohio Division Determination for evaluation of the presence or absence of a mental disorder, and for evaluation of any resulting limitations in mental activities required for work. (Tr. 635.)  Plaintiff indicated that she believed she was disabled due to lung cancer and anxiety. (Tr. 636.)  She had been to prison twice, "mostly for drugs, theft, and fraud." (*Id*.)  Despite admitting to heroin use one week prior, she told Dr. Evans she never used illegal drugs. (*Id*.)  She

---

[4]  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See DSM-IV at* 34.

had never been psychiatrically hospitalized, been under the care of a psychiatrist, or received mental health counseling.  (Tr. 637.)  Dr. Evans observed that Plaintiff had good grooming and hygiene; no problems with flow of conversation or thought; mildly anxious mood and affect; no evidence of psychosis, hallucinations, or delusional ideation; oriented to person, place, and time; and had adequate social judgement and insight into her problems.  (Tr. 637-38.)  He diagnosed depressive disorder, not otherwise specified; panic disorder, without agoraphobia; and assigned a GAF score of 53.  (Tr. 638.)

On March 9, 2012, State Agency psychologist Caroline Lewin, Ph. D., reviewed Plaintiff's medical records and determined that she had mild restriction of activities of daily living; moderate difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and, no repeated episodes of decompensation of extended duration.  (Tr. 102.)  Dr. Lewin assessed Plaintiff as being moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and, respond appropriately to changes in the work setting.[5]  (Tr. 106.)

On September 4, 2012, State Agency psychologist Leslie Rudy, Ph. D., reviewed Plaintiff's medical records and determined that she had mild restriction of activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and, no repeated episodes of

---

[5]  In all other areas, Plaintiff was found to be either "not significantly limited" or there was "no evidence of limitation."  (Tr. 106-107.)

8

decompensation of extended duration.  (Tr. 118-119.)  Dr. Rudy agreed with Dr. Lewin's mental RFC assessment.  (Tr. 122-123.)

On September 11, 2012, State Agency physician Teresita Cruz, M.D., completed a physical RFC assessment and opined that, in an 8-hor workday, Plaintiff could lift 10 pounds frequently and 20 pounds occasionally; stand/walk 6 hours; sit for 6 hours; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently kneel, crouch, or crawl; and, avoid concentrated exposure to extreme temperature, humidity, and even moderate exposure to fumes, odors, gases, and hazards.  (Tr. 121-122.)

On December 14, 2013, psychologist Douglas Pawlarczyk, Ph. D., completed a Mental Functional Capacity Assessment.  (Tr. 1658.)  He opined that Plaintiff was unemployable.  (*Id*.)  Dr. Pawlarczyk found marked limitations in Plaintiff's ability to interact appropriately with the general public; to accept instructions and respond appropriately to supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id*.)

**C.    Hearing Testimony**

**1.    Plaintiff's Hearing Testimony**

At the September 23, 2013 hearing, Plaintiff testified as follows:

- She obtained a GED and has no education beyond that level.  (Tr. 56.)

- She last worked in August of 2010 or 2011 as a janitor, which ranged from 40 to 60 hours per week.  (Tr. 57.)  She stopped working when she found out she had lung cancer.  (*Id*.)  She had a lobectomy in 2011 and chemotherapy concluded in March of 2012.  (Tr. 58.)  As of the time of the hearing, cancer had not returned.  (*Id*.)

- Since the surgery, she becomes short of breath after minimal walking. She can carry a 5 pound bag of sugar, a gallon of milk, or a 20 pound bag of potatoes, but not very far.  (Tr. 59-60.)  She needs to sit and rest after about 5 minutes of walking.  (Tr. 60.)  She can stand in for 10 to 15 minutes before needing to sit down.  (*Id*.)  She can sit for 30 minutes before needing to stand.  (*Id*.)  She is "not very good" at climbing stairs, stooping, crouching, or squatting.  (*Id*.)  She can bend, but has not attempted to crawl.  (Tr. 59-61.)

- Her psychological issues include anxiety and depression.  (Tr. 61.)

- She lives alone and prepares her own meals.  (Tr. 61.)  Her daughters come over to do the housework and laundry.  (*Id*.)  Her landlord handles the yardwork and snow removal.  (*Id*.)

- She spends her time reading, but has difficulty following what she reads due to poor concentration.  (Tr. 62.)  She also plays with her dogs.  (Tr. 62-63.)  Her landlord carries the dog food and cleans up after them in the yard.  (Tr. 63.)

- She does not drive since she had her license taken away after several car accidents.  (Tr. 62.)  She no longer wants to leave her house.  (*Id*.)

- She rarely watches television as it makes her nervous, especially the news.  (Tr. 62.)

- She does not interact with anyone aside from her daughters.  (Tr. 62.)

- She goes to the hospital a lot for panic attacks.  (Tr. 64.)

- She was incarcerated for a month for operating a vehicle while intoxicated.  (Tr. 65.)

- She was treated at a place called Manor Care in march of 2012 for an arm infection stemming from her injection of heroin.  (Tr. 66.)

- She had been sober for almost 10 years, and blames the painkillers she received after her lobectomy for causing a relapse.  (Tr. 66.)

10

### 2.      Medical Expert's Hearing Testimony

The ME testified that Plaintiff suffered from the following "severe" impairments as that term is defined under the Social Security Administration's regulations: anxiety disorder, drug dependence, and history of lung cancer.  (Tr. 72.)  When the ALJ asked if the lobectomy would reduce Plaintiff' abilities, the ME responded "[n]ot for most people."  (Tr. 72.)  With respect to Plaintiff, the ME testified that there was nothing in the medical record concerning a decrease in functional capacity based on the removal of a portion of one lung.  (Tr. 72-73.)  With respect to the severity of the B criteria, the ME indicated that there is "little to go on in the record."  (Tr. 77.)   The ME opined Plaintiff's impairments, individually or in combination, did not meet or equal any Listing.  (Tr. 77.)   The ME pointed out the records which stated Plaintiff enjoyed gardening.  (Tr. 78.)  Plaintiff denied being able to garden since her lobectomy.  (Tr. 78-79.)  He did not see a diagnosis of asthma in the record, and indicated that a diagnosis of COPD was not supported.  (Tr. 81.)  In addition, the ME noted no evidence in the record of seizures, and that Plaintiff's panic attacks are self limiting.  (Tr. 82.)  The ME stated that if he credited Plaintiff's testimony that she becomes fatigued easily, Plaintiff should be limited to sedentary work.  (Tr. 82.)  The ME noted that lifting 20 pounds occasionally and 10 pounds frequently was reasonable based on the record, but based on Plaintiff's testimony "possibly a little less."  (Tr. 83.)

### 3.      Vocational Expert's Hearing Testimony

The VE testified that Plaintiff's past work would be classified as housekeeping cleaner, Dictionary of Occupational Titles ("DOT") 323.687-014 and industrial cleaner,

DOT 381.687-018.  (Tr. 86.)  The ALJ instructed the VE that for the purposes of all

hypothetical questions, the VE should assume the individual was of the same age as

Plaintiff, with a high school education by way of a GED, and with the same past relevant

work.  (Tr. 87-88.)  The ALJ then posed the following hypothetical to the VE:

> The hypothetical person could and can do work at the sedentary
> exertional level only with all that implies with respect to exertional
> and postural limitations....  Subject to the following additional limitations:
> hypothetical person ... would not need a sit stand option.  Could not and
> cannot climb ladders, ropes, and scaffolds.  Could not and cannot perform
> work in an environment where there is exposure to fumes, chemicals,
> dust, or agricultural or landscaping pollens in concentration that exceed
> what would be in the environment outside of or
> away from the workplace.  Could not and cannot perform work at an
> environment where there is exposure to extremes of heat, cold, or
> humidity.  Could not or cannot work in proximity to unprotected heights,
> dangerous moving machinery, or other workplace hazards.  Could not and
> cannot operate a motor vehicle as part of a job.  Could and can do low
> stress work only.  Could not and cannot do work involving high or strict
> production quotas.  Could not and cannot do assembly line work or pace
> rate work.  Could not and cannot do work involving negotiation, arbitration,
> confrontation, or other intense interpersonal interactions with the public,
> coworkers, or supervisors.  Could not or cannot manage or supervise
> other people.  Could not and cannot do work involving the hypothetical
> person being involved for the health, safety, or welfare of other people.

(Tr. 88-89.)  The VE testified that such an individual could not perform Plaintiff's past

relevant work, but identified the following examples as jobs that such an individual could

perform: charge account clerk, DOT 205.637-014 (300 jobs locally, 4,000 in Ohio,

100,000 nationally); addresser, DOT 209.587-010 (300 jobs locally, 4,000 in Ohio,

100,000 nationally)); and, food and beverage order clerk, DOT 208.567-014 (400 jobs

locally, 4,000 in Ohio, 100,000 nationally).  (Tr. 89-91.)

The ALJ inquired as to the impact of an additional limitation to the above

hypothetical – being off task 20 percent of the workday due to psychological factors.

(Tr. 91.)  The VE responded that such a limitation would exclude all work.  (*Id.*)

In response to a third hypothetical incorporating the first one, the VE testified that a person who missed two days of work per month would be within the range tolerated by employers, but three days would eliminate competitive employment.  (Tr. 92.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the

13

impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since August 9, 2011,the application date (20 CFR 416.971 et seq.).

2.   The claimant has the following severe impairments (20 CFR 416.920(c)):

> Right upper lobe nonsmall cell lung cancer, status post right upper lung lobectomy with mediastinal lymph node resection done October 24, 2011, status post chemotherapy December 7, 2011 (Exhibit 11F) through March 9, 2012 (Exhibits 16F and 17F) despite chemotherapy being scheduled to continue until about April 30, 2012 (Exhibit 11F), status post residuals including emphysema and asthma.

> ***

> Panic disorder without agoraphobia.

> Depressive disorder not otherwise specified (NOS).

> Opioid and benzodiazepine dependence, possibly in remission since July 2013.  Heroin abuse possibly in remission since July 2013.

14

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to work subject to the following limitations on her ability to work:

- The claimant could and can do work at the sedentary exertional level only, with all that implies with respect to exertional and postural limitations (see 20 CFR 416.967 for further details about what those are), subject to the following additional limitations.

- The claimant would have needed and would need a sit stand option.

- The claimant could not and cannot climb ladders, ropes, or scaffolds.

- The claimant could not and cannot perform work in an environment where there is exposure to fumes, chemicals, dust, or agricultural or landscaping pollens in concentrations that exceed what would be in the environment outside of or away from the workplace.

- The claimant could not and cannot perform work in an environment where there is exposure to extremes of heat, cold, or humidity.

- The claimant could not and cannot work in proximity to unprotected heights, dangerous moving machinery, or other workplace hazards.

- The claimant could not and cannot operate a motor vehicle as part of a job.

- The claimant could and can do low-stress work only.

- The claimant could not and cannot do work involving high or strict production quotas.

- The claimant could not and cannot do assembly line work or piece rate work

15

- The claimant could not and cannot do work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors.

- The claimant could not and cannot manage or supervise other people.

- The claimant could not and cannot do work involving her being responsible for the health, safety, or welfare of other people.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on May 4, 1965.  At all times from August 9, 2011through the date of this decision, she was and is a younger individual age 45-49 (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).  Her education does not provide for direct entry into skilled work.

8. The claimant has no transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 9, 2011, the date the application was flied and the amended alleged onset date (20 CFR 416.920(g)).

(Tr. 33-42.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made

16

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.      Plaintiff's Assignments of Error

#### 1.  Substance Abuse as a Material Factor

In her second assignment of error, Plaintiff contends that the ALJ erred in failing to determine whether her substance abuse was material to her disability because, according to Plaintiff, the ALJ failed to comply with 20 C.F.R. § 404.1535 and Social

17

Security Ruling ("SSR") 82-60 .[6]  (Doc. No. 14 at pp. 13-15.)  The Commissioner denies that these regulations are applicable to the facts herein, as Plaintiff was not found to be disabled even *including* limitations stemming from Plaintiff's substance abuse.  (Doc. No. 16 at pp. 7-8.)  Therefore, the Commissioner asserts, the ALJ had no need to inquire into whether Plaintiff's drug abuse was material.  (*Id*.)

The Act prohibits an individual from receiving disability benefits if drug or alcohol abuse is a "contributing factor material to the ... determination that the individual is disabled."  42 U.S.C. §§ 423(d)(2)©, 1382c(a)(3)(J).  The relevant portion of the regulations state as follows: "*If we find that you are disabled **and** have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability....*"  20 C.F.R. § 416.935(a) (emphasis added).  In SSR 82-60, "*[w]here the definition of disability is met in a title XVI claim*, **and** there is evidence of drug addiction or alcoholism, a determination must also be made as to whether the drug addiction or alcoholism was a factor material to the finding of disability for purposes...."  (emphasis added).

The Court agrees with the Commissioner.  The language of the regulations is written in the conjunctive.  Therefore, an ALJ need only inquire as to whether a claimant's substance abuse is material if a claimant is first found disabled.  Plaintiff cites no authority suggesting that an ALJ must perform a materiality analysis even where the claimant was found "not disabled" with the inclusion of her substance abuse.

---

[6]  As Plaintiff has applied only for SSI, the applicable regulation is actually the parallel regulation found in 20 C.F.R. § 416.935.

Plaintiff contends that "the ALJ insinuates that Plaintiff's substance abuse is material, but deprives her of the required analysis to come to the conclusion." (Doc. No. 14 at p. 15.)  Merely because a claimant's substance abuse is designated a "severe impairment" does not axiomatically mean that the claimant is disabled when the impact of the substance abuse is included.  Nor is there any basis for Plaintiff's other assumption that an individual, who is found to be less than fully credible due to substance abuse/drug-seeking behavior, must be disabled.  Simply put, there is no need for an ALJ to determine "whether [a claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability" when the claimant is not disabled even with the effects of the substance abuse.

Plaintiff's assignment of error is without merit.

### 2. Credibility

Plaintiff third assignment of error is related to the second.  She argues the ALJ did not engage in a proper credibility analysis and specifically takes issue with the ALJ's finding that her level of pain, shortness of breath, and panic attacks were not fully credible.  (Doc. No. 14 at pp. 15-18.)  Plaintiff further argues that her substance abuse was not a valid reason for finding her not credible.  (*Id*.)

The Commissioner asserts the record supports the ALJ's reasoning, and Plaintiff's repeated drug-seeking behavior undermined her reliability concerning the alleged severity of her impairments.  (Doc. No. 16 at pp. 7-13.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.,*

19

667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).

      If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id*.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason

for the weight." SSR 96-7p, Purpose section; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"). To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96–7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[7]

Reading the decision as a whole, the Court finds the ALJ properly evaluated Plaintiff's credibility. After an extensive discussion of the medical evidence (Tr. 36-41), the ALJ found Plaintiff was not credible explaining as follows:

> The claimant's allegations of shortness of breath and pain are not credible, as she has virtually no treatment aside from repeated ER visits requesting Percocet. Given her admitted heroin addiction, pain complaints are simply difficult to find fully credible. She admitted in one of her few office visits that albuterol corrects any shortness of breath she suffers, and there is no medical evidence, even in terms of symptoms, that she has chronic shortness of breath.
>
> The claimant's reports of panic attacks are also not fully credible. She has received no counseling, and has very little regular psychiatric care at all. In May 2012, the claimant wrote that she had been to the ER four times due to her depression and anxiety. (exh. 7E p2) The claimant does have a very long history of ER treatment for her psychiatric symptoms, but this has been little more than requesting Xanax. She has no steady treatment, and instead simply receives benzodiazepines. Again, given the mild findings on exam and her substance abuse issues detailed above,

---

[7] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 96–7p, Introduction.

these complaints are less credible.

(Tr. 41.)

Plaintiff's brief recounts some of the evidence that she believes would support a finding that she is credible.  While Plaintiff may disagree with the inferences the ALJ drew from the evidence of record, that does not provide a basis for remand given the considerable deference accorded credibility determinations.  The Court also does not perform a *de novo* determination of Plaintiff's credibility.  The ALJ noted that there is little to no objective medical evidence to support the severity of Plaintiff's alleged symptoms, a finding that is supported by the ALJ's recitation of the evidence. Furthermore, the reasons given by the ALJ for finding Plaintiff less than fully credible incorporate several of the seven factors, as they discuss Plaintiff's medication, lack of any significant treatment other than medication, Plaintiff's rejection any pain management that did not involve opiates,[8] and substance abuse/drug-seeking behavior. The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Taynor v. Colvin*, 2014 WL 2580085 at * 18 (N.D. Ohio June 9, 2014) (White, M.J.);  *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Plaintiff contends that the ALJ may not "have it both ways," arguing that she should not be deemed less than fully credible due to substance abuse and drug-seeking behavior while, at the same time, not be entitled to an analysis of materiality. (Doc. No. 14 at pp. 16-17.)  As discussed above, there was no need for a materiality

---

[8]  The ALJ specifically noted Plaintiff "rejected any non-opiate pain management," Dr. Kerwin's notation of Plaintiff's "many untruths," and his suspicion of drug-seeking behavior.  (Tr. 37.)

analysis because the ALJ did not find that Plaintiff was disabled even with the inclusion of her substance abuse.  Plaintiff appears to assume that an individual with substance abuse problems who engages in drug-seeking behavior is *per se* disabled when taking into account the effects of that person's substance abuse.  Plaintiff's argument, moreover, suffers from a lack of any citation to legal authority.

"With respect to plaintiff's drug seeking behavior, courts have held that such behavior can form a basis for rejecting a claimant's testimony regarding pain and limitations." *Jackson v. Comm'r of Soc. Sec.*, No. 1:14-CV-628, 2015 WL 4611472 at *7 (W.D. Mich. July 31, 2015) (*citing Massey v. Comm'r of Soc. Sec.*, 400 Fed. App'x 192, 194 (9th Cir. 2010) ("the ALJ's interpretation that [the claimant] is engaged in drug-seeking behavior is a clear and convincing reason for disregarding his testimony"); *Poppa v. Astrue*, 569 F.3d 1167, 1172 (10th Cir. 2009) ("there is sufficient evidence in the record to support the ALJ's determination that [the claimant's] credibility about her pain and limitations was compromised by her drug-seeking behavior")*; Simila v. Astrue*, 573 F.3d 503, 5190 (7th Cir. 2009) (the ALJ could properly reject plaintiff's credibility based on drug-seeking behavior); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (the claimant's credibility undermined where he received a regimen of pain medication from two different doctors); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) ("[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations")); *see also Molen v. Comm'r of Soc. Sec.*, No. 3:12-CV-286, 2013 WL 3322300 at *13 (S.D. Ohio July 1, 2013) (finding that substantial evidence supported the ALJ's conclusion that, due to Plaintiff's drug-seeking behavior, "Plaintiff may have

23

sought care not for pain, but in order to obtain narcotics.")

It was not inappropriate for the ALJ to find Plaintiff less than credible based, in part, on her drug-seeking behavior.  As such, Plaintiff's assignment of error is without merit.

### 3.  Consultative Examiner

In her final assignment of error, Plaintiff contends the ALJ erred by rejecting the opinion of one-time examining physician, Dr. Pawlarczyk.  (Doc. No. 14 at pp. 11-13.) Plaintiff contends that the ALJ should have ascribed more weight to Dr. Pawlarczyk's opinion, who examined Plaintiff, than the testimony of the ME or the opinion of a non-examining source, Dr. Rudy.  (*Id*.)

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL

24

374184, *7 (July 2, 1996).

      The ALJ addressed Dr. Pawlarczyk's opinion as follows:

> I considered the opinions of Douglas Pawlarczyk, Ph.D., who did a one-time psychological examination of the claimant (but not for the State agency) on December 4, 2013.  (exh. 38F)  He diagnosed the claimant as having generalized anxiety disorder, agoraphobia without history of panic disorder, and some obsessive-compulsive personality "features" (the quotation marks were in the original).  He rated her global assessment of functioning as being 30 for "serious impairments."  He said that her abilities to do the following were markedly limited:  complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  He said that her ability to maintain attention and concentration for extended periods was moderately limited.  He rated the other 14 mental-related work-related abilities that he evaluated as being "not significantly limited."  He said that her conditions were expected to last 12 months or more.  He said that she was "unemployable."  I gave no weight to Dr. Pawlarczyk's opinions because they were not consistent with the record considered as a whole.  I gave no weight to his opinion that she was "unemployable" for the additional reason that this opinion was on an issue reserved for the Commissioner or his designees. 20 CPR 416.903, and 416.927(e)). See also SSR 96-Sp.

(Tr. 40-41.)

      Plaintiff is correct that the regulations state: "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 416.927(c)(2).  However, the mere fact that the ALJ gave more weight to non-treating non-examining physicians than to a non-treating but examining physician is not grounds for remand.  Here, the ALJ plainly *explained* why he was not ascribing any weight to Dr. Pawlarczyk's opinion – it was not consistent with the record as a whole.  The explanation requirement with respect to non-treating medical

sources "should not be confused with the standard required for the weight ascribed to treating sources [as] [t]he Sixth Circuit has held that the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another."  *See* *Alvarado v. Colvin*, 2016 U.S. Dist. LEXIS 27117 at \*\*10-11 (N.D. Ohio, Jan. 5, 2016) (White, M.J.) (*citing* *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496 (6ᵗʰ Cir. 2006), *adopted by* 2016 U.S. Dist. LEXIS 27111 (N.D. Ohio Mar. 3, 2016); *see also* *Allums v. Colvin*, 2015 U.S. Dist. LEXIS 169408 at \*\*64-65 (N.D. Ohio Nov. 25, 2015) (Limbert, M.J.) (also citing *Kornecky* for the same proposition); *Pierce v. Comm'r of Soc. Sec.*, 2015 U.S. Dist. LEXIS 147531 at \*14 (S.D. Ohio Oct. 30, 2015) ("courts have held that the failure to provide an explicit rationale for choosing between the competing opinions of non-treating sources is not necessarily a fatal error.")

While the Court's analysis could very well end here, it is worth noting that Plaintiff overlooks that the ALJ ascribed substantial weight to the opinion of psychologist Dr. Evans.  (Tr. 38.)  Like Dr. Pawlarczyk, Dr. Evans, was also a non-treating but examining source.  There is nothing unreasonable about the ALJ's decision to accord less weight to a decision he deemed an outlier in comparison to the opinions of  another examining source (Dr. Evans), a non-examining source (Dr. Rudy), and the ME (Dr. Macklin).  As such, Plaintiff's assignment of error is without merit.

26

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: April 25, 2016

27